UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOSEPH KINNEARY

                                    Plaintiff,

                                                        <u>COMPLAINT</u>
                                                        <u>JURY TRIAL DEMANDED</u>
                 --Against--                    05 Civ. 4201

CITY OF NEW YORK,

                                    Defendants,
------------------------------------------------------------------X

       Plaintiff, JOSEPH KINNEARY, by his attorneys, LAW OFFICES OF AMBROSE WOTORSON, alleges as follows:

       I.      <u>INTRODUCTION</u>

       1.      This is an action brought pursuant to Section 12101 *et seq.,* to vindicate the civil rights of plaintiff. Plaintiff contends that defendants altered the terms, conditions, and privileges of his employment on the basis of his recognized disability/impairment, Paruresis, and failed to accommodate his recognized disability, which, ultimately led to his termination without notice or an opportunity to be heard.

       II.      <u>JURISDICTION</u>

       2.      This Court has jurisdiction over this action under 42 U.S.C. Section 12101 *et seq*. Venue is proper, as the operative events occurred within this judicial district, and plaintiff received notice of a final agency action, from the Department of Homeland Security, regarding the suspension of his license to operate a vessel, on or about April 16, 2004. Finally, this Complaint is being filed within 90 days after receipt of a Right to Sue letter. (See Attached).

1

III.     PARTIES

3.     JOSEPH KINNEARY (hereinafter, "plaintiff") who resides in Suffolk County, New York, hereby sues in on his own behalf.

4.     CITY OF NEW YORK, through the NEW YORK CITY DEPARTMENT OF ENVIRONMENTAL PROTECTION is a state actor for 42 U.S.C. Section 1983 purposes. Defendant may sue and be sued, and its principle place of business is in Queens County.  The Department of Environmental Protection, a New York City Agency, is located at 59-17 Junction Blvd., Flushing, New York 11373.  It is sued for having violated plaintiff's civil rights while acting under color of state law and/or acting pursuant to its own practices, customs and policies.

IV.     FACTUAL AVERMENTS

5.     Plaintiff is employed by the City of New York as a Captain with the New York City Department of Environmental Protection.

8.     In light of a collective bargaining agreement which mandates that plaintiff could not be subjected to adverse employment actions without a showing of just cause, and in light of the Civil Service Laws, plaintiff has a protected property interest in his job as a Captain and as an employee with the New York City Department of Environmental Protection.

6.     Plaintiff's performance has been fully satisfactory at all relevant times since October 1987.

7.     However, the terms, conditions, and privileges of plaintiff's federal employment have been adversely affected on the basis of his recognized disability/impairment, Paruresis, in the following ways:

    a.     At all relevant times, plaintiff was an employee of the New York City Department of Environmental Protection (hereinafter "DEP"). He operated

a.     a municipal tanker and held a captain's position, for which he was subject to random drug testing pursuant to U.S. Department of Transportation regulations.

b.     Plaintiff is a graduate of the Merchant Marine Academy, and he earned a Ph.D. in Biology from Rutgers University.

c.     Since 1971, he has suffered from paruresis, or shy bladder syndrome. Paruresis is a common medical/psychological condition in which a person is unable to urinate on demand and under certain circumstances, and it clearly impacts upon a major life function, to wit, urinating.

d.     Plaintiff previously informed an agent of the City of New York, that he had this condition, but she dismissed his disability and told him to "get over it".  In so informing the City of New York about his condition, plaintiff sought a reasonable accommodation permitting him to be drug tested by alternative means.

e.     In 1998, plaintiff was able to produce a sufficient urine sample during a random drug screen, but only after nearly three hours of trying.

f.     On December 27, 2001, a representative of NEDPC, a private firm under contract with the City of New York to conduct random drug tests, asked plaintiff to provide a urine sample for testing, knowing that he had had difficulty providing a sample on demand because of his disability.

g.     In response to the NEDPC employee's request, plaintiff attempted to urinate during three hours of trying for another random drug screen, and he was unable to do so. The person administering this test knew of plaintiff's

|   |   |
|---|---|
|   | prior inability to urinate on demand. In fact, the tester specifically recognized plaintiff's condition as "shy bladder syndrome," and told plaintiff that at least one other NYC employee could not provide a urine sample because of this syndrome. |
| h. | Shortly thereafter, plaintiff was sent to see a physician at the City of New York Department of Sanitation's Medical Clinic at 44 Beaver Street. There, plaintiff asked to be given an opportunity to provide a urine sample by alternative means, but the physicians in charge did not permit any alternative tests. |
| i. | On December 28, 2001, plaintiff's private physician, Dr. A. D. Calderbank, who had examined him, provided a note explaining that plaintiff suffered from *chronic* paruresis. |
| j. | On January 3, 2001, plaintiff hand-delivered Dr. Calderbank's note to City of New York agents and then returned to work. Approximately two hours later, plaintiff was sent home and told to report to a DEP disciplinary counsel the next day. |
| k. | Municipal defendant's own medical personnel did not believe that plaintiff had ever been a drug user, so there was nothing plaintiff had to hide. Plaintiff was simply unable to produce a urine sample on demand, due to his disability. |
| l. | On January 4, 2002, despite this knowledge and plaintiff's medical note, DEP officials suspended plaintiff from employment for 30 days, after serving him with disciplinary charges, but without giving him a hearing on |

|     | those charges prior to his suspension. The basis of the suspension was that plaintiff had intentionally refused to provide a urine sample upon demand. |
| --- | --- |
| m.  | On January 5, 2002, an independent lab analyzed a blood sample from plaintiff and found it to be negative for any proscribed substances. |
| n.  | On February 12, 2002, plaintiff was served with charges from the US Department of Homeland Security, through the Coast Guard containing identical allegations to those contained in his DEP disciplinary charges. |
| o.  | Plaintiff has continuously made it known that he is ready to provide and/or to submit to any alternative drug tests, including blood tests. Moreover, the City of New York's Department of Environmental Protection is able to have and/or to cause plaintiff to be subjected to such alternative drug tests, but to date, has refused to do so. |
| p.  | Plaintiff provided hair samples to independent laboratories on two occasions to be tested at his expense. And as expected, those tests confirmed that plaintiff did have any proscribed substances in his system. |
| q.  | On March 7, 2002, plaintiff was ordered to give urine for a return-to-duty drug test. When plaintiff was unable to do so, because of his disability, he was allowed to take a saliva test. |
| r.  | Thereafter, DEP returned plaintiff to work only in an administrative capacity. |
| s.  | From March 25, 2002 through July 22, 2002, plaintiff continued his efforts to return to his Captain's position and provided DEP with additional medical documentation to show that he suffered from Paruresis. |

5

t. On April 14, 2002, the New York Times published an article in which plaintiff was quoted, highlighting the injustice done to him by DEP in adversely affecting his employment because of his disability.

u. On July 22, 2002, DEP gave plaintiff another saliva test. The test was negative, and on March 7, 2002, NEDPC cleared plaintiff to return to work.

v. On August 9, 2002, plaintiff was reassigned to his Captain's position.

w. On October 16, 2002, the Department of Homeland Security, through the Coast Guard, held an administrative hearing on its own charges against plaintiff.

x. On February 20, 2003, an Administrative Law Judge upheld the Coast Guard's charges and recommended a *suspension* --not a revocation-- of plaintiff's Captain's license due his repeated failure to urinate on demand.

y. On March 18, 2003, the Department of Homeland Security, through the U.S. Coast Guard, suspended plaintiff's Captain's license. But for plaintiff's inability to urinate on demand, plaintiff's license would not have been suspended.

z. Plaintiff appealed the decision, and separately, applied for a temporary license. Plaintiff obtained a temporary license almost immediately, and on June 16, 2003, he was reinstated to his Captain's position and he was able to continue working.

aa. On November 25, 2003, plaintiff visited the DEP's Marine Superintendent, Abe Luttderodt to find out what, if anything, he needed to do to maintain his temporary license to operate a vessel, as it was due to expire on December 12, 2003. Luttderodt telephoned Chief Warrant Officer Storen of the United States Coast Guard, who had previously issued the temporary license to plaintiff.

bb. Chief Warrant Officer Storen agreed to process plaintiff's application for renewal of a temporary license, but he stated that plaintiff should bring a physician's note stating that he still suffered from paruresis; a letter explaining the facts of his case; an original order from the ALJ granting him the right to obtain a temporary license; and a copy of his temporary license.

cc. On or about December 8, 2003, plaintiff brought these documents to Chief Warrant Officer Storen. Chief Warrant Officer Storen simply stated that he would "get back to [plaintiff]." Moreover, plaintiff's employer was promptly made aware, in writing, of plaintiff's license renewal process.

dd. Indeed, plaintiff continued his duties, and plaintiff continued to operate a vessel, even whilst his license renewal application was pending, with his employer's full knowledge and imprimatur. At no time was plaintiff informed that he could not continue to operate a vessel whilst his application was pending.

ee. On December 12, 2003, the same date that plaintiff's temporary license was due to expire, he received a letter from the Department of Homeland

7

|     | |
| --- | --- |
|     | Security, through the U.S. Coast Guard, stating that a license could not be issued because plaintiff had not sent in an application, and an application fee of $45. The letter also stated that upon receipt of the same, the Coast Guard would approve plaintiff's application. |
| ff. | Plaintiff showed this letter to Marine Superintendent Lutterodt, and he promptly sent to the Coast Guard an application to renew his license and an application fee of $45. |
| gg. | Plaintiff received a canceled check for the $45 application of fee, and in the interim, he continued to operate a vessel, with the full knowledge and imprimatur of his employer. |
| hh. | However, whilst license renewal application was pending, a newspaper, the Staten Island Advance, on February 22, 2004, carried an article about drug testing and paruresis. Critically, the article mentioned plaintiff's case. |
| ii. | On February 25, 2004, plaintiff received a telephone call at his home from Marine Superintendent Lutterodt. |
| jj. | Lutterodt told plaintiff that he would being taken off of the vessel the next day, and that the DEP had been receiving telephone calls querying why he was being permitted to operate a vessel while his application for a temporary license was pending. |
| kk. | On February 26, 2004, plaintiff was not permitted to work on his assigned vessel and he was given administrative duties instead. |

ll.  Thereafter, but on that same day, plaintiff visited Chief Warrant Officer Storen, who told plaintiff that the Commander in charge of marine inspections would sign off and approve his temporary license renewal application the next day.

mm.  However, John Chen, a Section Chief of the DEP, later told plaintiff that the NYC "Inspector General's Office [had] gotten involved."

nn.  When plaintiff later called Chief Warrant Officer Storen to pick up his license from the Coast Guard, Chief Warrant Officer Storen stated, without elaboration, that his license was not ready for pick up. Later still, Chief Warrant Officer Storen telephoned him and asked him to fax a document previously submitted on December 8, 2003, detailing his suspension. Once again, plaintiff complied, but reminded Chief Warrant Officer Storen that he had previously complied with this directive.

oo.  On March 2, 2004, a representative of the New York City Inspector General's Office, boarded plaintiff's assigned vessel to review the log book.

pp.  Two days later, on March 4, 2004, the DEP, through Marsha Rothem, Zoe Ann Campbell and Louis Tazzi, terminated plaintiff from the DEP effective "immediately," without notice or any opportunity to be heard, though plaintiff was entitled to the same since he was a New York Civil Service employee, and his union contract did not waive his due process rights.

qq. By virtue of defendants' behavior in summarily terminating plaintiff, plaintiff has lost a job which pays $62-$75,000 a year.

rr. On April 1, 2004, plaintiff telephoned Chief Warrant Officer Storen. Storen then told plaintiff for the first time, that his license renewal application was being handled by a US Coast Guard Investigator, Lt. Robert Mutto, and that it was being sent to Washington, D.C. to be processed.

ss. On April 13, 2004, plaintiff's Coast Guard Appeal was denied as being untimely, thereby imposing a suspension of plaintiff's license to operate a vessel.

tt. It is clear, that but for plaintiff's disabling condition, he would not have been charged, and subsequently suspended by the DEP with failure to provide a urine sample. As well, plaintiff's license to operate a vessel would not have suspended, had he not had a disabling condition of being unable to urinate upon demand.

uu. To date, despite numerous requests, the Department of Homeland Security, through the U.S. Coast Guard, has tarried, and has otherwise refused to process plaintiff's application for a temporary license.

8. As a further proximate result of defendant's' discriminatory acts towards plaintiff, plaintiff has suffered a loss of earnings, bonuses and other employment benefits.

9. As a further proximate result of defendants' discriminatory actions towards plaintiff, plaintiff has suffered impairment and damage to plaintiff's good name and reputation.

10. As a further proximate result of defendant's discriminatory actions towards plaintiff, plaintiff has suffered mental anguish and emotional injury.

11. As a further proximate result of defendant 's discriminatory actions towards plaintiff, plaintiff has been unable to ameliorate his employment situation.

V. **CAUSES OF ACTION**

12. Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

17. By discriminating against plaintiff because of his disability condition, to wit, paruresis, defendant violated 42 U.S.C. Section 12101 *et seq.*

VI. **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays that this Court grant to him judgment containing the following relief:

    a. Reinstatement;

    b. An award of damages to be determined at the time of trial to compensate plaintiff for mental anguish, humiliation, embarrassment, and emotional injury;

    c. An award of punitive damages to be determined at the time of trial as against each individual defendant;

    d. An award of reasonable attorney fees and the costs of this action and;

    e. Such other and further relief as this Court may deem just and proper.

Dated: Brooklyn, New York
April 27, 2005

Respectfully Submitted,
Law Offices of Ambrose Wotorson, P.C.

By_____/s/_____
Ambrose W. Wotorson (AWW—2412)

26 Court Street
Suite 1811
Brooklyn, New York 11242

718-797-4861